Gregory B. Beam (SBN 102443)
Mark D. Alpert (SBN: 138152)
GREGORY BEAM & ASSOCIATES, INC.
23113 Plaza Pointe Drive, Suite 100
Laguna Hills, CA 92653
(949) 598-5800
malpert@beamlaw.net

Attorneys for Plaintiffs
Michael Windeler, Karen Windeler, Joy Salerni, Jeff Schneider, Edna Schneider, Barbara Knight, Kent Knight, Bruce DePaola, Terri DePaola

UNITED STATES DISTICT COURT OF CALIFORNIA

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL WINDELER, KAREN WINDELER, JOY SALERNI, JEFF SCHNEIDER, EDNA SCHNEIDER, BARBARA KNIGHT, KENT KNIGHT, BRUCE DEPAOLA, TERRI DEPAOLA,

Plaintiffs and Petitioners,

vs.

CAMBRIA COMMUNITY SERVICES DISTRICT; COUNTY OF SAN LUIS OBISPO,

Defendants and Respondents.

Case No. 2:19-cv-06325-DMG-E

**AMENDED COMPLAINT FOR:**

**(1) VIOLATION OF CIVIL RIGHTS – TAKING UNDER FIFTH AMENDMENT (42 U.S.C. § 1983)**

**(2) VIOLATION OF CIVIL RIGHTS – PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)**

## Introduction

1. Can a local government prevent the owners of legally created lots from ever developing those lots by deciding to deprive those lot owners of access to water and sewer services necessary to develop without causing a regulatory taking or other denial of constitutionally protected rights? That is the fundamental question this case presents.

For decades, the County of San Luis Obispo ("County"), acting in concert with the Cambria Community Services District ("District"), has prevented lot

owners from developing their property under the pretense of a water shortage or water "emergency" to justify the denial of water and sewer services, even refusing to accept applications for service. The County and District have purposely taken no action to secure water for these legal lots in order to prevent development without being required to pay compensation for lots taken to advance a policy of extremely limited development. The actions of the County and District have made clear they have no intention of allowing development, particularly as to the lots owned by the Plaintiffs in this case. The Defendants have engaged in a pattern of conduct designed to make it impossible for plaintiffs to ever develop their lots, effectively confiscating them for the public purpose of limiting growth, but seek to avoid the requirement that the owners of property taken for public use be compensated. If the Defendants cannot be required to meet their obligation to provide water and sewer service to legal, buildable lots, Plaintiffs must be compensated for the regulatory taking of their property.

## PARTIES

2. Plaintiffs ("Plaintiffs") Michael and Karen Windeler ("Windelers") are citizens of the State of Alabama.

3. Plaintiff Joy Salerni ("Salerni") is a citizen of the State of Texas.

4. Plaintiffs Jeff and Edna Schneider ("Schneiders") are citizens of the State of Florida.

5. Plaintiffs Barbara and Kent Knight ("Knights") are citizens of the State of Nevada.

6. Plaintiffs Bruce and Terri DePaola ("DePaolas") are citizens of the State of Washington.

7. Plaintiffs are informed and believe, and on that basis allege Defendant County of San Luis Obispo ("County") is and at all times mentioned herein, was a duly incorporated municipal corporation located within the State of California.

8. Plaintiffs are informed and believe, and on that basis allege Defendant

Cambria Community Services District ("District") is and at all times mentioned herein, was a duly incorporated municipal corporation and/or special district located within the State of California, and County of San Luis Obispo.

9. Plaintiffs are informed and believe and thereon allege, that each of the Defendants named herein as Does 1 through 25, inclusive, were and are in some manner responsible for the acts, omissions and actions as hereafter alleged and for the harm or damage caused by Defendants to Plaintiffs and are, therefore, jointly and severally liable for and all damages or harm caused to Plaintiffs.

10. Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned the Defendants, and each of them, including the fictitiously named Defendants, were the agents, employees or officers of each of the remaining Defendants, and, in doing the things hereafter alleged, were acting within the scope, course and purpose of said agency or employment, and were acting within the apparent scope of said agency, employment and position and acted with the permission and consent of each of the remaining Defendants.

JURISDICTION AND VENUE

11. Plaintiffs' claims are all based on federal, subject matter jurisdiction. This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 *et seq*. Knick v. Twp. of Scott, Pennsylvania, 139 S. Ct. 2162, 2167 (2019) ("We now conclude that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled. A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it.") In addition, Plaintiffs bring their claims under federal diversity jurisdiction, 28 U.S.C. 1332. Plaintiffs are all citizens of states other than the state of California and thus completely diverse from Defendants who are California municipal entities. The amount in controversy exceeds $75,000 as to each individual plaintiff.

12. Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391(b) in that the named defendants are located within the Central District of California, and the action arises out of events in San Luis Obispo County, California.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

13. The Plaintiffs own legally created and approved, but undeveloped, residentially zoned lots in Cambria, located in an unincorporated area within the County of San Luis Obispo. Plaintiffs all own lots which were purchased at a fair market price that reflected the reasonable expectation that the lots could be developed. Plaintiffs have paid for water and sewer improvements for decades, through water and sewer availability or standby assessments, property taxes, and a special assessment to finance the construction of the District's sewer system. Water and sewer lines are in the street fronting all of the Plaintiffs' lots.

14. The County and Cambria County Water District (the District's predecessor in interest) executed two Joint Power Agreements (JPA's) on or about the early 1970's. Therein, the parties agreed that (a) a sewer system was necessary in Cambria; (b) the County would conduct assessment proceedings to finance the construction of sewer improvements; and (c) the Cambria County Water District would own and operate the resulting sewer improvements.

15. The resulting assessment proceedings created two assessment districts, and the Board resolved that the assessed properties were to benefit from and be assessed in proportion to the cost of the improvements. The special benefit accruing to the assessed properties was and remains the right to use the District's sewer system.

16. The first phase of the sewer improvements was financed by a HUD loan between the federal government and Cambria County Water District. The intent of the HUD loan and associated assessment proceedings was to provide sewer service

to those properties within assessment district #1. The HUD loan was repaid by special assessments upon those properties within assessment district #1.

17. The second phase of sewer improvements was financed by an EPA grant between the federal government and County. The EPA grant required assessments to pay the local matching share of the cost to complete the improvements. The landowners within assessment district #2 were assessed and thereby paid the local matching share required by the EPA grant. The intent of the EPA grant and associated assessment proceedings was to provide sewer service to those properties within assessments district #2. The Properties are within assessment district #2.

18. On or about 1976, the District was created and assumed all duties and liabilities of the Cambria County Water District, which was simultaneously dissolved.

19. Plaintiffs believe and thereon allege that their properties were among the class of properties intended to benefit from the JPA's, HUD loan, and EPA grant ("Agreements"). Plaintiffs believe and thereon allege that their properties were to benefit from the assessment proceedings, wherein their properties were to obtain a special benefit right from the payment of special assessments. The special benefit that accrued was the right to sewer service from the District. The Plaintiffs have all paid assessments to the District and its predecessor, but they have been denied the intended benefit of the assessment, the right to sewer service.

20. Plaintiffs are informed and believe, and on that basis allege that the Defendants have determined they will not provide sewer or water service because they wish to prevent the lots from being developed, effectively re-zoning the properties (and hundreds of others like them) as open space, while avoiding paying the lot owners for the creation of this open space.

21. In 1988 the Windelers purchased a lot in "Cambria" an unincorporated area located within the County. The property is located on Ramsey Road, and is

zoned for the development of a single family residential home, herein referred to as the ("Windeler Property"). The Windelers paid a fair market price for their property, based on the reasonable expectation that it could be developed with a single-family home.

22. Salerni is informed and believes, and on that basis alleges that in the 1940s her grandfather purchased a lot in Cambria, which was bequeathed to her mother and was subsequently bequeathed to Salerni in 1967. The lot is located at 955 Drake Street, and is zoned for the development of a single-family home. Salerni is informed and believes that her grandfather paid a fair market price for the lot, based on the reasonable expectation that it could be developed with a single-family home. Salerni retained the lot, based on the reasonable expectation that it could be developed with a single-family home.

23. The Schneiders purchased one lot in 1976 and a second adjoining lot in 1978. The lots are located on Spencer Street in Cambria. The lots were subsequently merged and are zoned for the development of a single-family home, herein referred to as the "Schneider Property". The Schneiders paid a fair market price for the lot, based on the reasonable expectation that it could be developed with a single-family home.

24. Barbra Knight purchased 8 adjoining lots in Cambria in 1968. She subsequently conveyed a joint interest in the lots to her husband Kent Knight, who she married in 1972. The Knights eventually sold four of the lots but retained four lots, located on Haddon Drive, which were subsequently merged into a single parcel ("Knight Property"), and is zoned for the development of a single-family home. Barbara Knight paid a fair market price for the lots based on the reasonable expectation that they could be developed with single- family homes.

25. The DePaolas purchased their lot in Cambria in 1989. The lot is located on Pine Court. The lot is zoned for the development of a single-family home, herein referred to as the ("DePaola Property"). The DePaolas paid a fair

market price for the lot, based on the reasonable expectation that it could be developed with a single-family home.

26. All of the Plaintiffs have sought to obtain water and/or sewer service through the District, secure a place on a waiting list for water and sewer service when it becomes available, and to simply obtain verification that the District has no plan to provide services to their properties. The District, however, has indicated at various times that "at this time" it is not accepting applications for service and does not even have an application to verify whether it plans to provide future services, citing a decades long water "emergency." The District most recently confirmed in November 2017 it is not accepting applications for future water and/or sewer service.

27. In January 2017, Plaintiffs submitted an application for a minor use or land use permit with the County, the local land use authority. The unprocessed applications were returned and thereby rejected. It was subsequently verified that the applications were returned because they were not accompanied by written verification of water and sewer service from the District.

28. Plaintiffs are informed and believe that it is impossible under the County's laws and regulations to develop a single-family home on their lots without obtaining water and sewer service from the District. However, in order to confirm whether there were any conditions under which the lots could be developed without water or sewer service from the District, the Windelers submitted a development application which sought development without water and/or sewer service from the District. The Windelers elected to seek a variance from the requirements for written verification of water and sewer service from the District. They submitted a Development Application to the County on or about April 24, 2017, with a request for a variance from all requirements that would bar development without written verification of water and/or sewer service from the District.

29. Because development would not be possible without the Variance, the

County and the Windelers agreed to proceed to hearing first with the Variance request that was submitted with the development application. The Development Application required a variance from several County standards and requirements, including Community Wide Planning Area Standard 8, which requires development applications to include written verification of water and sewer service from the District. The Development Application and cover letter made clear that the Windelers were prepared to develop with any combination of services that would be acceptable to the County. Specifically, they were prepared to develop with water sourced from an on-site well or trucked in water, with wastewater treatment from the public sewer or an on-site septic system. The Windelers also requested that, alternatively, the County require the District to process and approve a connection to the District's water and sewer systems.

30. The Application first went before the County Planning Commission ("CPC"). The hearing on the Application before the CPC took place on August 24, 2017. The CPC applied § 22.62.070(D)(1) of the County Code ("County Variance Code") in considering the variance, which sets forth five findings that must be made in order grant a variance. Prior to, and at the hearing, counsel for the Applicants argued that all of the requirements were met to approve the variance. At the hearing, counsel for the Windelers emphasized the need for the administrative record to include all communications between the various departments of the County and outside agencies, particularly including the District. Notably, the staff report states a referral was made by the County to the District.

31. At the close of the hearing, the CPC denied the Application finding that it did not satisfy any of the five factors of the County Variance Code that must be met to support the granting of a variance. The CPC concluded that allowing the Windeler Property to develop without District water and sewer service would be inconsistent with the District's Buildout Reduction Program and the County's growth limitations found in its Local Coastal Program. The CPC found that the

denial of the application would not cause a taking.

32. The Windelers timely filed an appeal to the County Board of Supervisors ("Board"). The appeal asserted the CPC had erred. In the letter attached with the appeal, the Windelers emphasized that the record on appeal should include all communication between staff and internal and external organizations, particularly including the District. Approximately 10 days before the hearing, counsel for the Windelers reminded staff of this request and inquired as to whether the record before the Board would include this information. Staff did not respond to this inquiry. Staff did prepare a staff report recommending denial, but the report did not include any communications between staff and either internal or external entities, and did not reference the request in any fashion. The request was simply ignored.

33. The appeal hearing took place on October 17, 2017, before the Board of Supervisors. Initially, staff gave an oral summary of the written staff report. In an apparent response to the Applicants' request to be allowed to either use an on-site water well or trucked in water along with a connection to the District's sewer, staff commented that it was unknown whether the District would provide sewer but not water service to the lot. At the hearing, counsel for the Windelers addressed the failure to include communication between staff and various internal and external agencies and noted that the failure to include such communication denied the Applicants a fair hearing. For example, staff had itself noted uncertainty regarding the District's position regarding the proposal to use only District sewer services for development, but declined to include communications with the District including the referral seeking review of the Development Application. Counsel for the Windelers again addressed the findings necessary to approve a variance, along with the requirement that the County apply its Coastal Ordinance in a manner that avoided a taking, which the Windelers contended would result from the denial of the variance.

34. At the close of the hearing, the Board voted to deny the appeal,

adopting the staff recommendation that none of the five factors under the County Variance Code necessary to grant a variance were supported and approved the findings prepared by staff in advance of the hearing. On October 24, 2017, the County officially adopted Resolution No. 2017-265, denying the appeal of the denial of the Application ("Resolution"). The Resolution affirmed the Planning Commission's findings that none of the five factors under the County Variance Ordinance were met. The Board found that allowing the Windeler Property to develop without District water and sewer service would compel the Board to allow development of other similar properties (i.e., those without District wait list position, including those owned by the non-Windeler Plaintiffs) which would be inconsistent with the growth assumptions in the County's Local Coastal Program. The Resolution did not address the question of whether there was a taking.

35. The denial of the Windelers' Application demonstrates that their property cannot be developed and that the County can never grant a variance that would allow development for their property or other lots under one half acre that do not already have water and sewer service or a waiting list position for water service. The Windeler Property cannot be used as subdivided and zoned, and the Windelers have been denied all economically viable use of their property. Plaintiffs other than the Windelers are, from the standpoint of an available variance, in substantively the same position as the Windelers and thus have likewise been denied all economically viable use of their property. The multiple findings, each independently justifying the denial of the variance would, almost certainly, each apply to the other Plaintiffs. For example, the CPC and Board found that a) development without water and sewer service from the District would require an amendment to the County's Title 26 (Growth Management Ordinance) which cannot be waived with a variance, b) state health and safety regulations prevent a domestic well and septic system on lots under one half acre (each of the properties is well below one half acre), and c) development of 1871 lots without wait list positions would be inconsistent with the

District's Build Out Reduction Program and growth assumptions in the County's Local Coastal Program. In other words, it would be futile for the remaining plaintiffs to pursue development of their properties through a variance or any other form of application as they do not have and cannot get verification of water or sewer service from the District and the County will not allow development without such verification. Since the Plaintiffs do not have wait list positions, and District Code prevents them from applying to join the closed waiting list, the properties are not eligible to obtain intent to serve letters.

36. Plaintiffs are informed and believe and on that basis allege that the decision of the County to exclude communications and information from the District, including the response to the referral of the development application done purposefully with the intent of preventing the record from including information that would support a taking or other damage claim. Plaintiffs are informed and believe and on that basis allege that the District response to the referral would demonstrate that the Windeler Property is not eligible for water and/or sewer service from the District. Rather than a shortage of water, regulations adopted and implemented to limit development are the irrefutable reason Plaintiffs are ineligible to obtain verification that the District plans to provide services to the properties. In sum, development is not permissible because District Code prevents the properties from obtaining water and sewer services from the District, and the County cannot approve the use of alternative sources of water and wastewater treatment.

37. In September, 2018, Mr. Singewald, a senior planner for the County who worked on the Windelers' application confirmed in a newspaper article that the District's moratorium on new water connections is consistent with the County's zero percent growth policy Singewald confirmed that in order to allow new development in Cambria, the District would have to lift its moratorium on new water connections and the County would have to amend the growth ordinance to increase Cambria's growth rate to higher than zero percent. . In other words, the District's

"moratorium" on issuing intent to serve letters is a temporary circumstance for those with wait list positions. Likewise, the County's zero growth moratorium is a temporary circumstance for those landowners with wait list positions. Whereas, Plaintiffs are prohibited from developing now or after these moratoriums are lifted because they are subject to a permanent bar on new connections to water and sewer. Plaintiffs are informed and believe and on that basis allege that the County and District have utilized a "moratorium" rather than explicitly banning any new connections to avoid liability for taking or other claims.

38. Plaintiffs are informed and believe that their lots have zero or de minimus value because of the decision of Defendants to not provide water and/or sewer service or allow development of their properties. Plaintiffs, and each of them, have paid assessments levied to repay water infrastructure loans, property taxes, and all water and sewer availability or standby assessments levied to support the water and sewer infrastructure for Cambria. In addition, Plaintiffs were subjected to a special assessment which paid for the build out of the sewer infrastructure in Cambria. As a result of this special assessment, Plaintiffs have an express and/or implied right to connect to the public sewer fronting Plaintiffs' properties.

39. Plaintiffs have been denied the right to develop single family homes on their property purportedly of an "emergency" shortage of water. Plaintiffs are informed and believe they have been denied the right of development because of the decision to stop or severely limit growth. Indeed, Defendants have adopted permanent growth limiting regulations, which arise from the exercise of land use authority, and will remain in place whether or not there is a shortage of water.

40. In reality, the County, working in concert with the District, has decided it will not allow Plaintiffs and hundreds of other property owners the right to develop their lots out of a desire to preserve the coastal character of Cambria by, at least in part, limiting growth. Plaintiffs are informed and believe that Defendants were aware their actions and inactions would have the effect of taking Plaintiffs'

property for public use without compensation and developed a course of action designed to prevent or inhibit property owners from obtaining just compensation.

41. Plaintiffs are informed and believe that whether or not the water emergency declaration was valid, it is a temporary measure. The District has a duty to seek additional water to lift the emergency and avoid predictable future shortages. In other words, the District cannot use the water emergency as a cloak to hide the undeniable truth that it will never provide intent to serve letters or future service connections to Plaintiffs' properties. Plaintiffs are informed and believe that Defendants have determined they will not allow the lots, and hundreds of others like them to be developed, effectively re-zoning the lots for open space without formally taking such action.

42. Plaintiffs are informed and believe that Defendants have intentionally used the temporary water shortage as a shield to avoid taking claims that would otherwise arise from the explicit adoption of growth limiting regulations applied to Plaintiffs and similarly situated lot owners or open space re-zoning that prevent Plaintiffs and similarly situated property owners from developing legal lots. Plaintiffs are informed and believe that the County and District have conspired to deny development while preventing taking claims from being ripe, purposefully leaving Plaintiffs and hundreds of other lot owners in a legal limbo, with no right of development but no definitive decision permanently denying them the right to develop. Plaintiffs are informed and believe, and on that basis allege the District has adopted a strategy of not accepting applications for service in order to avoid denying applications for service, while the County refuses to accept applications for development based on the absence of a letter affirming that the District actually plans to provide water and sewer service to the lot.- Nonetheless, Plaintiffs allege the County applied the regulatory scheme by rejecting development applications submitted by all Plaintiffs thereby determining that none of the properties can be developed.

43. The County and District have failed to take steps to acquire sufficient water that could serve hundreds of legal lots, nor have they taken any steps to compensate the owners of these lots, even though on information and belief, the County and District have decided, in the interests of the community as a whole, that these lots should not be developed. In fact, Plaintiffs are informed and believe and thereon allege that District, in concert with County, has developed plans to obtain additional water for lot owners who have secured a place on the District wait list, but affirmatively decided that this additional water source be designed and limited so as to serve only those lot owners. Plaintiffs are informed and believe and on that basis allege that such decision was made in an effort to comply with growth limitations adopted by the County. Plaintiffs are informed and believe that Defendants' strategy is one of attrition, attempting to avoid explicitly denying development applications, while hoping that through attrition, the owners of these lots who purchased based on the expectation that the lots can be developed will simply "go away" one way or another over time, thereby confiscating these properties to advance the purpose of the no growth agenda by regulation, without paying for the lots.

## FIRST CAUSE OF ACTION

**(By All Plaintiffs Against All Defendants For Violation of Civil Rights under 42 U.S.C. § 1983 And The Fifth Amendment For Regulatory Taking of Property)**

44. Plaintiffs refer to, repeat and incorporate herein by reference as though fully set forth at length, the allegations previously set forth in this pleading.

45. Plaintiffs are informed and believe, and on that basis allege that the actions and intentional inactions by Defendants constitute a taking of property for public use without compensation and is contrary to the Fifth Amendment of the United States Constitution.

46. Plaintiffs are informed and believe that Defendants, acting in concert, have determined that they will never allow Plaintiffs to develop their lots to advance the public purpose of limiting growth to maintain the coastal character of Cambria,

effectively re-zoning the properties to open space without formally taking such action. Plaintiffs are informed and believe and on that basis allege that Defendants have likewise denied Plaintiffs a connection to the sewer system, a property right they are entitled to utilize as a result of paying a special assessment for the construction of the sewer system for the same purposes.

47. Plaintiffs are informed and believe, and on that basis allege that Defendants have intentionally decided against developing water resources that would allow additional development. For example, the District is seeking a permit for its Sustainable Water Facility which is designed with only sufficient capacity and will be limited to serve existing dwellings and those lots already on a District wait list. Plaintiffs are informed and believe, and on that basis allege the District employs the declared water emergency and a moratorium on issuing intent to serve letters as the excuse for not issuing service application forms, or processing service applications submitted by Plaintiffs and intentionally avoids taking steps to provide sufficient water resources. By failing to inform Plaintiffs that it has no plans to serve the properties even after the emergency is lifted, the District's actions are nothing less than an attempt to block development without payment of just compensation.

48. Plaintiffs are further informed and believe that Defendants, acting in concert, have established procedures and policies designed to prevent development applications from being accepted, processed, approved or denied by the County.

49. Plaintiffs are informed and believe, and on that basis allege, the taking is permanent because Defendants have taken no actions that will allow for the development of sufficient water in the foreseeable future and have also affirmatively taken steps to incorporate growth limitations that, as a practical matter, will make it impossible for Plaintiffs to develop their lots even if an alternative water source was developed at some point. Alternatively, Plaintiffs allege the taking is temporary, extending from the time (unknown to Plaintiffs) that the Defendants determined they

would not provide water and service to undeveloped lots not on the District waiting list, continuing until such time as the Defendants take steps to provide water and sewer service for Plaintiffs and similarly situated property owners.

50. The combined effect of the Defendants' actions is to deny Plaintiffs all economically viable use of their property and compel Plaintiffs to bear a disproportionate individual cost of the Defendants' effort to limit growth in order to preserve the coastal character of Cambria and effectively re-zone hundreds of lots as open space. Should Defendants wish to limit growth or create new open space by denying the right of certain lots to be developed, that burden is one which, in all justice, must be borne by the community as a whole, rather than those property owners denied the right of development of legal lots that are in all respects developable, if the District were to meet its obligation to provide water and sewer service to all parcels within its service boundary.

51. The Defendants have caused a "per se" taking because they have denied Defendants all economically viable use of their properties.

52. Alternatively, Plaintiffs allege a taking under the ad hoc balancing of factors approved under federal law. In particular, Defendants have caused a regulatory taking based on combined effect of the consideration of, the nature of the state interest in regulation, and the reasonable investment –backed expectations of the property owners, and the economic impact of the regulation. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). Defendants' actions result in the equivalent of a physical taking because they force Plaintiffs to effectively surrender their right of possession to the property indefinitely to be maintained as "open space" while requiring Plaintiffs to bear the cost and burden of maintaining these lots. For all practical purposes, the Defendants have confiscated the Plaintiffs' property for public use, but have not provided compensation.

53. The Defendants have refused to withdraw or modify the offending regulations, so Plaintiffs must be monetarily compensated for the taking. As a direct

and proximate result of the above-described actions by Defendants and each of them, Plaintiffs are informed and believed they have had their property taken with individual values exceeding $300.000 for each lot.

54. Plaintiffs have been damaged by the taking of its property in an amount to be proven at trial, but Plaintiffs are informed and believe the property taken by Defendants has a value in an amount well in excess of three hundred thousand dollars per lot.

55. Plaintiffs have incurred and will continue to incur attorneys' fees, expert witness fees, and other fees and costs, as a result of this proceeding, in amounts that cannot yet be ascertained but which are recoverable pursuant to the provisions of 42 U.S.C. §§ 1983 and 1988.

SECOND CAUSE OF ACTION

**(By Windelers Against All Defendants For Violation of Civil Rights under 42 U.S.C. § 1983, the Denial of Substantive Due Process Clause of the United States Constitution)**

56. Plaintiffs refer to, repeat and incorporate herein by reference as though fully set forth at length, the allegations previously set forth in this pleading.

57. The actions of the Defendants in processing Plaintiffs' applications are arbitrary, capricious, unreasonable and pretextual, and part of a concerted effort to prevent legal lots from development and to prevent the ripening of claims. The Defendants' actions and inactions and the County's denial of the Variance Application were pretextual, part of an intentional effort to prevent development of lots and prevent the ripening of legal claims.

58. Plaintiffs are informed and believe, and on that basis allege that the Defendants have used temporary water law authority to shield from scrutiny the exercise of permanent land use authority to cap growth to benefit the community as a whole, without compensating the affected landowners. Plaintiffs are informed and believe, and on that basis allege that Defendants have intentionally avoided

developing water to serve legal lots, including those owned by Plaintiffs, thereby contributing to or causing a "permanent emergency" used as a tool to effectuate the goal of limiting growth and forcing Plaintiffs' (and hundreds of other) lots to be preserved as open space.

59. Plaintiffs have been damaged by the actions and inactions of Defendants in an amount to be proven at trial, but Plaintiffs are informed and believe the damage is an amount well in excess of three hundred thousand dollars per lot along with thousands of dollars in legal and other costs associated with Plaintiffs' efforts to secure the right to develop their lots.

60. Plaintiffs have incurred and will continue to incur attorneys' fees, expert witness fees, and other fees and costs, as a result of this proceeding, in amounts that cannot yet be ascertained but which are recoverable pursuant to the provisions of 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiffs pray judgment as follows:

AS TO THE FIRST CAUSE OF ACTION:

1. For a judgment mandating Defendants pay Plaintiffs just compensation for property taken in an amount to be proven at trial;

AS TO THE SECOND CAUSE OF ACTION:

2. For a judgment declaring that Defendants have violated the procedural and/or substantive due process rights of Plaintiffs and damages according to proof;

//

//

//

//

//

//

//

//

AS TO ALL CAUSES OF ACTION:

3. For costs of suit, including reasonable attorneys' fees, including the costs and attorneys' fees incurred in the administrative hearing;

4. For such other and further relief as the Court deems just and proper.

Dated: July 24, 2019 GREGORY BEAM & ASSOCIATES, INC.

By: /s/ Mark D. Alpert
Mark D. Alpert
Attorneys for Plaintiffs and Petitioners

DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims and causes for which a jury trial is available.

Dated: July 24, 2019 GREGORY BEAM & ASSOCIATES, INC.

By: /s/ Mark D. Alpert
Mark D. Alpert
Attorneys for Plaintiffs and Petitioners