# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

MICHAEL WINDELER, et al.,
  Plaintiffs,

       v.

CAMBRIA COMMUNITY
SERVICES DISTRICT, et al.,
  Defendants.

CV 19-6325 DSF (JEMx)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This matter came was tried before the Court from November 9, 2021 to November 18, 2021. After examining the evidence, hearing the testimony of witnesses, and considering the arguments of counsel, the Court finds as follows:

## I. Findings of Fact[1]

### A.    Plaintiffs' Properties

1.     Plaintiff Joy Salerni, a resident of Texas, owned[2] a lot (APN 023-066-010) on Drake Street in the unincorporated community of Cambria, in the County of San Luis Obispo (Salerni Property). The Salerni Property is 9,735 square feet with a 16% slope. Ms. Salerni inherited her property in 1968; her cost basis is $4,500.

---

[1] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law. Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

[2] Nina Dodgen, Executor of the Estate of Joy Salerni, was substituted for Joy Salerni on August 10, 2022.

The Salerni Property has never had water or sewer service. Declaration of Joy Salerni (Salerni Decl.); Declaration of Frances Mason (F. Mason Decl.), ¶ 21.[3]

2.  Barbara and Kent Knight, residents of Nevada, own a lot (APN 023-391-053) in Cambria on Haddon Drive (Knight Property). The Knight Property is 6,750 square feet with a 19% slope. Barbara Knight purchased the property in 1971 for $5,600, although that price included property that later sold for $50,000. The Knight Property has never had water or sewer service. Declaration of Barbara Knight (Knight Decl.); F. Mason Decl. ¶ 23; Trial Transcript (Tr.) 143:19, 144:1-5, 146:12-147:14.

3.  Plaintiffs Jeff and Edna Schneider, residents of Florida, own a lot (APN 024-062-043) in Cambria on Spencer Street (Schneider Property). The Schneider Property is 6,258 SF in size with a 22% slope. The Schneiders purchased their property in 1975 for $3,650. The Schneider Property has never had water or sewer service. Declaration of Jeff Schneider (Schneider Decl.); F. Mason Decl. ¶ 22; Tr. 266:6-7.

4.  Plaintiffs Michael and Karen Windeler, residents of Alabama, own a lot (APN 023-202-018) in Cambria (Windeler Property). The Windeler Property is 4,000 SF in size with a 38% slope. The Windelers purchased their property in 1988 for $13,000. The Windeler Property has never had water or sewer service. Declaration of Karen Windeler (Windeler Decl.); F. Mason Decl. ¶ 20; Tr. 74:15-16.

5.  Plaintiffs Bruce and Terri DePaola, residents of Washington, own a lot (APN 023-423-002) in Cambria on Pine Court (DePaola Property). The DePaola Property is 5,850 SF in size with a 46% slope. The DePaolas purchased their property in 1989 for $27,500. The DePaola Property has never had water or sewer

---

[3] Direct testimony was provided by declaration.

service.  Corrected Declaration of Bruce DePaola (DePaola Decl.);
F. Mason Decl. ¶ 24; Tr. 173:25-174:2.

6.   Plaintiffs' vacant lots are zoned Residential Single-Family and
are located in the Coastal Zone of the unincorporated County.  F.
Mason Decl. ¶¶ 20-24.

7.   Plaintiffs' lots are all well under a half-acre in size, and several of
their lots are at a very steep grade and serviced by narrow
hillside roads, unpaved in some cases, and located in an area of
the County that is high fire risk and rural in nature, with limited
ingress and ingress.  Id.; Declaration of William Hollingsworth
(Hollingsworth Decl.) ¶¶ 11, 27.

8.   Plaintiffs presented no evidence that: (1) there is water beneath
their lots, (2) there is any company that would provide trucked-in
potable water to Cambria (at an economically sensible price or
otherwise), or (3) that drilling a well or installing a water tank on
their undersized lots could be achieved without violating state
and local codes.

9.   Plaintiffs did not have any concrete plans to build on their lots
when they acquired them between 1968 and 1989 or at any time
in the next few decades thereafter.  See generally Pls. Trial
Testimony.

10.  Most of the Plaintiffs took no steps to market their lots for sale or
pursue inquiries by potential buyers, except for the Knights who
sold a portion of their property for $50,000 in the 1980s.  Tr.
147:6-8, 11-14.

11.  Plaintiffs have admitted that their vacant lots have value.
Declaration of D. Michael Mason (D. Mason Decl.) ¶ 27.

12.  On December 8, 2015, a vacant Cambria lot at 2180 Andover
Place with an active water meter connection sold for $265,000.
Ex. 143 at 26.  According to Plaintiffs' expert appraiser D.
Michael Mason, "(t)his was the best indicator of value of what a

3

parcel of land with a water meter is worth" on the June 20, 2021 valuation date.  Id.

13. On August 5, 2020, the Windelers received an unsolicited offer from Vacant Land Now LLC to buy their property for $27,770.35. Tr. 108:20-109:10. The Windelers did not respond to this offer. Id.

**B.   Background and History of Water and Sewer Hookup Limits**

14. Defendant Cambria Community Services District (CCSD) is a special district organized and existing under the laws of the State of California. Decl. of Michelle Bland (Bland Decl.) ¶ 16.  CCSD provides water, wastewater treatment (sewer), solid waste disposal, fire protection services, and other public services to the unincorporated coastal town of Cambria. Id.

15. Defendant County of San Luis Obispo is a political subdivision of the State of California and is located within the Central District of California.

16. Cambria is a relatively remote coastal town located in the California state Coastal Zone.  Decl. of Airlin Singewald (Singewald Decl.) ¶ 9.  As a result, it falls within the jurisdiction of the California Coastal Commission (Commission), a state agency, and is subject to the regulations imposed by the Coastal Act of 1976, Cal. Public Resources Code (PRC) Sections 30000 et seq.  Id. ¶¶ 9, 24.  Cambria has limited access between the town and the rest of the County.  Id. ¶ 9.

17. Cambria suffers from chronic drought conditions and a historical shortage of water dating back decades.  See Bland Decl. ¶¶ 27, 43-53; Ex. 863 at 011; Ex. 954; Ex. 1211; Ex. 1212.

18. Cambria is also designated as a High Fire Severity Zone as of 2004, with some Very High Fire Hazard Severity Zones to the northeast of the village, which remain in effect today. Hollingsworth Decl. ¶ 11; Bland Decl. ¶ 23.

19. In the 1970s, the County approved two bond issues for sewer assessments in Cambria – Cambria Assessment District No. 1 in 1971 and Cambria Assessment District No. 2 in 1976. Exs. 1323 & 1324.  The bonds were used to construct sewer infrastructure in Cambria. Id.

20. These bond issues were paid off, respectively, by 1996 and 2001. Decl. of Justin Cooley (Cooley Decl.) ¶ 18.  Since 2001, none of the Plaintiffs' lots has ever been subject to any County sewer assessment and no Plaintiff has ever paid any County sewer assessments in the past 20 years.  Id. ¶ 20.  None of the Plaintiffs' lots has ever been subject to any County water assessment and no Plaintiff has ever paid any County water assessments.  Id. at ¶ 17.

21. In February 1986, CCSD's Board of Directors adopted Ordinance No. 2-86, which implemented a wait list (Wait List) for new water and sewer hookups, on findings of limited water resources, to "ensure that demand for water shall not exceed available supply and that the pace of allocating the available water supply to new users is reasonable and orderly."  Ex. 362.

22. By joining the Wait List, property owners were eligible to receive intent to serve letters from CCSD to connect to the CCSD water and sewer systems. Id.

23. Effective December 31, 1990, the CCSD Wait List was closed. Exs. 805, 1261 at 12.

24. Plaintiffs were all specifically aware of the existence of the Wait List prior to its closure.  Tr. at 89:15-90:5 (Windeler); 157:20-159:9 (Knight);[4] 174:25-175:6, 176:12-177:1 (DePaola); 210:4-211:4 (Salerni); 273:9-15 (Schneider).

---

[4] Barbara Knight's testimony was ambiguous.  She denied knowledge of the Wait List before the last five years, but also testified both at deposition and trial that she had at least "hearsay" knowledge of the possible existence of such a wait list.  At the very least, the Knights had notice of the possibility of

25.   None of the Plaintiffs attempted to obtain a position on the Wait List at any time from its formation to its closure.  Id.

26.   CCSD has not accepted applications for new sewer or water service from any property owners without a Wait List position since December 31, 1990.  Ex. 1077 at 49.

27.   The PRC requires the County to adopt a Local Coastal Program (LCP), and the Commission must approve and certify the LCP, including any amendments.  PRC § 30512.

28.   In 1988, the Commission approved and certified the County's LCP, codified at Title 23 of the County Code, which governs Cambria.  Ex. 1217.  However, the Commission has permanent ongoing responsibilities in the Coastal Zones, including Cambria, and it has appellate authority over specified categories of development.  PRC § 30603.

29.   If anyone appeals the County's discretionary approval of a project involving property in the Coastal Zone, the Commission decides whether a substantial issue exists and whether to reverse the County's approval.  PRC § 30625.

30.   Plaintiffs' lots are located in the Coastal Zone and a sensitive coastal resource area.  Tr. 803:4-6.  Therefore, Plaintiffs' lots are all within the jurisdiction of the Commission under PRC § 30603(a)(3).

31.   On October 30, 1990, the County adopted a Growth Management Ordinance (GMO), County Ordinance No. 2477, codified at Title 26 of the County Code.  Ex. 1261.  That ordinance "froze" the CCSD water wait list and started a County wait list for allocations for new dwelling units in Cambria.  Id. at 12.

32.   The County adopted the GMO because, among other things, the County had experienced rapid growth over the prior decade and

the existence of the Wait List.  It is uncontroverted that the Knights never attempted to join the Wait List.

the magnitude of increases "raised serious questions about whether available resources are capable of handling the extraordinary growth and its related problems . . . . " Ex. 1261 at 1. The County's Board of Supervisors (BOS) stated that if growth continued at the rate of the prior decade, there would be "environmental deterioration and depletion of the resources necessary to sustain that growth such that there will be a threat to the public health, safety and welfare." Id. at 2.

33.   The GMO initially set the growth rate County-wide as follows: "The Maximum Annual Allocation shall be limited to an amount sufficient to accommodate an annual increase of 2.3% in the number of dwelling units." The rate for Cambria was similarly established at 2.3%. Ex. 1261 at 9, 11.

34.   The GMO requires the growth rate to be reviewed annually, per Resource Management System (RMS) Annual Reports, approved by the County's Board of Supervisors (BOS) at a public hearing. Ex. 1261 at 9.

35.   The GMO expressly allows the County to accept applications for new residential projects accompanied by an intent to serve letter for transferred water meters. County Code § 26.01.070(10)(a)(1); Singewald Decl. ¶ 16.

36.   The GMO is amended frequently. See Exs. 1261 to 1293. Each year, the County reconsiders the growth rates set forth in the GMO. Tr. 784:4-15. The County usually amends the GMO in three-year cycles in accordance with the annual reports of the County's RMS. Singewald Decl. ¶ 14.

37.   However, "if there were changes to the resource levels in Cambria, that would be an opportunity for the (BOS) . . . to change the growth rate for Cambria, even if it's outside of the three-year cycle." Tr. 785:24-786:10.

38. On January 18, 2000, the County adopted Ordinance No. 2895, which reduced Cambria's growth rate to 1% based on RMS Annual Reports.  Ex. 1267 at 7.

39. On November 15, 2001, CCSD declared a Cal. Water Code § 350 Emergency (Drought Emergency) and established a moratorium on new residential water permits.  Ex. 863 at 011.  The Drought Emergency and moratorium remain in effect today.

40. CCSD issued intent to serve letters to properties on the Wait List in an amount based on the GMO, and if any property was not ready to develop, the property owner was permitted to defer indefinitely without losing his/her place on the wait list.  See Ex. 861 at 7.

41. At some point from 1990 to 2001, every property on the Wait List during that period was given the opportunity to obtain an intent to serve letter from CCSD.  Bland Decl. ¶ 99.

42. Therefore, had Plaintiffs obtained a spot on the Wait List when it was open, they would have been offered water and sewer service at some point prior to 2001.

43. On July 24, 2003, CCSD set a buildout target for the number of connections it would be able to support at 4,650.  This target encompassed only current water users plus the potential users on the Wait List at that time.  Bland Decl. ¶¶ 155-56.

44. In setting the buildout target, CCSD prioritized providing consistent sufficient water for present users.  The buildout target did not contemplate being able to provide service for any other properties – other than those on the Wait List – in the foreseeable future. Ex. 874 at 10; Bland Decl. ¶ 159.

**C.    Plaintiffs' Efforts to Acquire Water and Sewer Hookups**

45. In 2010, Plaintiff Jeff Schneider investigated building a home on his vacant Cambria lot.  Id. at 269:23-25.

46.   In support of that goal, Schneider investigated buying a water meter.  Tr. 269:2-22.

47.   In 2010, water meters were selling for approximately $50,000 on average, which was more than Schneider was willing to pay.  Tr. 271:1-5, 272:6-11; Schneider Decl. ¶ 15.

48.   In 2001, Plaintiff Karen Windeler investigated buying a water meter.  Tr. 1127:15-21.  A realtor told Windeler that she could buy a water meter for $70,000 and that she could later sell the meter for double its price at $140,000.  Id. at 1131:5-11.

49.   Windeler decided not to buy a water meter because $70,000 was too much money and she hoped that she would be able to obtain an intent-to-serve letter.  Id. at 1131:22-1132:1.  She knew at the time that buying a water meter was the "first step" in developing her lot under the rules in place at the time.  Id. at 1130:14-16.

50.   On January 11, 2011, the Windelers requested that they be added to the CCSD's water wait list.  Ex. 933.

51.   Their request states that "[the Windelers] would like to submit a development proposal to the County to determine the use that can be made of their property."  Id. at 1.

**D.   Windeler Attempt to Acquire a Development Permit from the County**

52.   In 2017, the Windelers applied to the County for a variance to build a 2002 square foot house on a 4,000 square foot, steeply sloped lot.  Ex. 1230.  In the letter accompanying the Application, the Windelers requested a variance from three sections of the County Code.  Ex. 1229.

53.   First, the Windelers requested a variance from County Code § 19.07.022 relating to septic systems.  Id.  Among other things, that Code section – and related Local Agency Management Program – prevents the installation of a water well and septic system on a property that is less than one-acre in size, restricts

the use of septic systems on properties with slopes greater than 25%, and prohibits a septic system within 100 feet of a water well.

54. Because the Windelers proposed using a septic system,[5] the application form required that they answer questions regarding: (1) the results of percolation tests and piezometer tests; (2) the separation distance between the septic tank and any water well; and (3) whether any approvals from the Regional Water Quality Control Board (RWQCB) were required.  Ex. 1230 at 5.  These questions were not answered.  Id.

55. The development proposed by the Application threatened health and safety because "[c]onstructing a well and septic system in close proximity to each other due to site constraints would likely result in potable water contamination from the sewage discharge from the septic system."  Declaration of Leslie Terry ¶ 10.

56. The Windelers also requested a variance from County Code § 19.07.040(b), which sets forth minimum standards for water wells, including that "a domestic well shall provide a minimum capacity of 5 gallons per minute."  Ex. 1229.

57. Plaintiffs' water expert had no evidence that a well on any of Plaintiffs' properties would produce 5 gallons per minute of water, if any at all.  Tr. 986:15-18, 987:20-25.

58. Plaintiffs' expert did not perform any investigation to determine whether there was any water under any of their properties, e.g., consulting geological reports, digging test wells, or speaking with any drilling companies.  Tr. 988:1-990:23.

---

[5] The Application to some extent contradicts the letter submitted with it.  The letter clearly indicates that the Windelers intend to use a septic system and sought a variance to do so, but the Application itself suggests that the Windelers intend to attach to the existing public sewer system.

59.   Plaintiffs' expert testified that it would cost approximately $100,000 to drill one test well, just to determine if there was any water under the lot.  Tr. 1004:3-1005:22.

60.   The Application also sought a variance from County Code § 19.07.041 and Planning Area Standard CW-8.  Ex. 1229.  These would normally require the Windelers to obtain a CCSD intent to serve letter in order to develop their property.

61.   However, the Application did not contain any information to enable the County to determine that "there is adequate water and sewage disposal capacity available to serve the proposed development" in the absence of such a connection to the CCSD system.  <u>See</u> County Code § 23.04.430; Exs. 1229, 1230.

62.   As an alternative to a water well, the Application proposed "trucked-in" water as a primary source of potable water.  <u>See</u> Exs. 1229 at 4, 1230 at 5.

63.   The County has not historically allowed new development if water delivered by truck is the primary source of potable water.  Singewald Decl. ¶ 47.

64.   The Windelers' representative who applied for the variance admitted that he did not "have any information that there was any company that would deliver trucked in water to Cambria in bulk" to satisfy the demands of the Windelers' proposed development.  <u>Id.</u> at 338:2-339:1.

65.   The Windelers' Application was denied by the County on October 17, 2017 both because there was no basis to treat the Windelers' property differently from other similarly situated properties and because the proposed variances would adversely affect the public health and safety.  Ex 1250.

**E.   General Sources of Water for the Cambria Area**

66.   CCSD's sole source of water, which must supply water to all of CCSD's customers and provide all water necessary for fire

suppression for the entire community of Cambria, comes from well fields that divert groundwater from the San Simeon and Santa Rosa Creeks (Creeks), pursuant to permanent licenses from the State Water Quality Control Board (State Board) Division of Water Resources (DWR).  Bland Decl.¶ 25; Tr. 475:14-18, 1089:7-15.  The groundwater pumped and diverted by CCSD percolates underground from the Creeks.  Id.

67.   CCSD's licenses allow it to divert 799 acre feet per year from its primary water source, the San Simeon Creek (limited to 270 acre feet during the dry season), and up to 218 acre feet per year from its secondary source, the Santa Rosa Creek (limited to 155.3 acre feet during the dry season).  Bland Decl. ¶ 38; Exs. 757, 758.

68.   The total licensed amount is not necessarily available to CCSD in a given year, as a result of a number of restraints and conditions in the licenses themselves, as well as other physical and regulatory constraints such as well levels, water levels in the aquifer, rainfall, and demand from riparian and agricultural users.  Bland Decl. ¶¶ 39-41; Ex. 757 at 6.

69.   The amount of water available to CCSD is reduced by the usage of upstream users, which include agricultural riparian water rights holders, who all have water rights senior to CCSD.  Bland Decl. ¶¶ 54-58.

70.   CCSD's appropriative water rights are junior to the water rights of these upstream riparian and agricultural users.  Bland Decl. ¶¶ 56-60.

71.   The Creeks are supplied one hundred percent by rainfall and therefore are extremely susceptible to drought conditions and dependent on adequate annual rainfall.  Tr. 543:17-22, 614:22-25; Bland Decl. ¶ 26.

72.   The Creeks are coastal creeks that flow into the Pacific Ocean in Cambria.  CCSD's jurisdictional boundaries generally, and its

well fields specifically, are located at the "end" of the coastal Creeks, where they flow into the Pacific Ocean.  Bland Decl. ¶ 55.

73.   CCSD's ability to divert water from the Creeks is also limited by the need for enough water to remain in the Creeks to sustain high-quality habitat for a variety of aquatic and terrestrial species.  Bland Decl. ¶¶ 61-62.

74.   The United States Fish and Wildlife Service (USFWS) designates the Creeks as a critical habitat because they provide habitat for federally threatened South-Central Coast Steelhead and federally endangered Tidewater Goby.  Bland Decl. ¶ 63; Tr. at 539:14-19.

75.   Both Creeks are located in Environmentally Sensitive Habitat Areas (ESHA).  CCSD's diversion from the Creeks is subject to the requirements of the Endangered Species Act due to the presence of sensitive species and habitat in the Santa Rosa Creek.  Bland Decl. ¶¶ 63-64; Exs. 1007, 1014.

76.   CCSD has not been able to prove that its existing water supply is an adequate and sustainable supply that can serve even existing development in Cambria without significant resource harm.  Bland Decl. ¶ 65; Ex. 1014 at 9; Tr. 655:2-5.

77.   CCSD's water supply is not adequate to safely and sustainably add new water connections outside existing commitments; CCSD is therefore unable to provide water or sewer service to Plaintiffs' properties without transfer of an existing meter.  Tr. 635:19-25; 732:18-733:4; Bland Decl. ¶ 67; Hollingsworth Decl. ¶¶ 41-50.

78.   The shortage of water claimed by Defendants is not a mere pretext to prevent growth, as suggested by Plaintiffs.  There are legitimate public concerns about the ability of CCSD to continue to provide sufficient water consistently to its current users, let alone any significant number of new users.

**F.    Defendants' Exploration of Alternative Water Sources and Conservation Efforts**

79.    During the 1990s, CCSD analyzed and pursued the development of a desalination plant to augment its existing water supply.

80.    CCSD eventually received bids in response to its solicitations relating to a proposed desalination project, which were discussed at several public Board meetings.

81.    The Board expressed concern at the costs of the facility, particularly in light of the newly passed Proposition 218 that placed significant new limits on CCSD's ability to collect revenue, both from assessments and increasing water rates.  See generally Ex. 821 at 1-9.

82.    Based on the bids received, the costs of the desalination facility would have exceeded $16,000,000 in 1997.  CCSD did not have funding for this projected cost and believed that the public in Cambria would not support such an outlay.  Ex. 429.

83.    At the Board's August 25, 1997 public meeting, the Board rejected all bids submitted for the offshore and onshore facilities because all of the bids were in excess of the Board's budget for desalination, and therefore they could not be accepted before they expired.  Exs. 429, 454.

84.    In February 1999, as part of the Water Conservation and Retrofit Program, the Board directed staff to pursue a more sharply tiered water rate structure to induce water conservation by CCSD's customers.  Exs. 839, 1011.

85.    Around this time, Methyl tert-butyl ether (MtBE) contamination of Santa Rosa Creek seriously disrupted pre-established CCSD priorities, including efforts to develop a desalination project or other water sources, because manpower was shifted to dealing with this MtBE crisis.  Exs. 841, 843.

86. The contamination forced the closure of two of CCSD's wells in the Santa Rosa wellfield, SR 1 and SR 3. Ex. 856 at 2.

87. The contamination created a crisis for both CCSD's water supply and finances and was an unbudgeted problem CCSD was forced to handle. Id.

88. On February 10, 2000, the Board approved a consultant services agreement with Kennedy/Jenks Consultants (Kennedy/Jenks) to undertake a baseline water supply and available analysis as Task 2 of the update to CCSD's Water Master Plan. Ex. 845.

89. On April 13, 2000, Kennedy/Jenks prepared a Final Project Design Report for a "value engineered" desalination project, estimated to cost $6,660,700, well under half the cost for the project considered in 1997. Ex. 449 at 7.

90. In August 2000, CCSD held a public advisory referendum on whether it should pursue the updated, value engineered desalination project. Ex. 847. The referendum passed, with 58% voting in favor. Id.

91. On March 30, 2001, the Board authorized staff to seek $10,300,000 in federal funding to fund the value engineered desalination project. Ex. 471 at 1.

92. In 2001, pursuant to authorization from the Board, CCSD began to work with the U.S. Army Corps of Engineers (USACOE) to complete tasks related to developing a desalination facility proposed in the Kennedy/Jenks April 13, 2000 Final Project Design Report. Ex. 468 at 2.

93. After several further years of planning and preparation, at an April 17, 2004 public meeting, after receiving an "ear mark" appropriation from the federal government in the amount of $10,300,000 to fund a desalination project at CCSD's request, the Board adopted a resolution authorizing CCSD to execute a Project Cooperation Agreement with the USACOE for the purposes of developing a desalination project. Ex. 471.

94. In 2004, the County approved a coastal development project (CDP) allowing the geotechnical investigation along the San Simeon Creek beach area that was necessary for CCSD's proposed desalination project.  See Ex. 895 at 15.

95. The County's approval of the CDP was appealed to the Commission by two environmental groups as well as two individual Commissioners.  Ex. 895 at 1.

96. In 2007, after multiple hearings and alterations to the plans, the Coastal Commission denied the requested CDP for the geotechnical investigation necessary for the proposed desalinization plant.  This essentially ended the possibility that such a plant could be built in the foreseeable future.  See Exs. 896, 898, 901.

97. On May 25, 2000, CCSD acquired 418 acres of land known at the East-West Ranch (Ranch), subject to conditions that it be used for open space and recreational preservation.  Exs. 843, 844.

98. The purchase of the Ranch reduced overall future water demand. Ex. 603 at 5, 7-8.

99. In light of the above, CCSD has taken significant steps over the past decades to both seek new sources of water, e.g., desalinization, and to find ways to reduce consumption, e.g., tiered water rates, taking agricultural land out of production.  It has not solely relied on reduced or frozen development to address Cambria's water situation.

## G.   Actions Regarding Water and Sewer Hookups for Other Public Applicants

100. Between 2014 and 2019, the County approved applications for discretionary permits for single family residential projects on vacant lots if the applications were submitted with a CCSD intent to serve letter, were accompanied by the required fees, and otherwise conformed to applicable codes and regulations. Singewald Decl. ¶ 32.

101.  The following five single family residential projects are examples of discretionary approvals issued by the County, after review and decision at noticed public hearings, to build single family homes on vacant lots in Cambria.  Each of the applications was submitted within the past eight years accompanied by CCSD intent to serve letters: Settimi (approved by the County on December 20, 2019); Hadian (approved by the County on September 6, 2019); Swift (approved by the County on June 21, 2019); Orellana (approved by the County on June 16, 2017); and Fox (approved by the County on July 18, 2014).  Id.

102.  All five of these projects were appealed to the Coastal Commission.  Exs. 1014, 1256- 1260.

103.  The Commission staff found a "Substantial Issue" existed with all five approvals and recommended denial on de novo review even though the vacant and unimproved residential lots in question all had intent to serve letters from CCSD. Id.  The main stated reason for rejection was insufficient water resources in the Cambria area to meet even existing demand, let alone new development.

104.  All five projects ultimately were either rejected by the Commission or withdrawn by the applicant prior to the Commission's final decision.  Singewald Decl. ¶¶ 33-41.

105.  The Commission's decisions and the Commission's Staff recommendations strongly suggest that the Commission will not approve new development in Cambria absent a significant increase in water resources.

**H.    Other Coastal Commission Actions**

106.  As discussed above, the Commission is the ultimate decision making body with respect to the approval or denial of CDPs allowing development in Cambria.

107. The LCP allows development only of properties in Cambria that
had existing service commitments at the time of the moratorium.
Tr. at 634:9-16, 645:4-5.

108. The Commission has repeatedly found that new development in
Cambria cannot be accommodated absent a new water supply
and that any development potentially threatens the coastal
resource protection requirements of San Simeon and Santa Rosa
creeks, the underlying groundwater, and other coastal resources.
See Exs. 1014, 1256- 1260.

109. As mentioned above, at four separate hearings, the Commission
denied CCSD's attempts to simply *investigate* the feasibility of
seawater desalination intakes at two different locations – the San
Simeon Creek beach and the Santa Rosa Creek beach – despite
significant assistance and support from the USACOE.

110. These denials make plain that obtaining the Commission's
ultimate approval of a CDP allowing the actual development and
operation of a seawater desalination project is not likely, as the
Commission has instead refused to allow even initial feasibility
investigations in support.

111. In short, because of water shortages, the Commission appears
solidly against further development of land in Cambria, but it is
also opposed to allowing CCSD to pursue desalination – probably
the most likely possibility for providing additional water supply
to Cambria.

## II. Conclusions of Law

### A.    Statute of Limitations

1.    The applicable statute of limitations in this case is two years
from the July 24, 2019 filing.  Wilson v. Garcia, 471 U.S. 261,
279-80 (1985); Canatella v. Van de Kamp, 486 F.3d 1128, 1132
(9th Cir. 2007); Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir.
2001); Cal. Code Civ. Proc. § 335.1.

2. CCSD has not taken any action with respect to Plaintiffs' properties within the applicable two-year limitations period, <u>i.e.</u>, after July 24, 2017.  The latest discrete action by CCSD that might be at issue is the setting of the buildout target on July 24, 2003.  As a result, all of Plaintiffs' claims against CCSD are barred by the statute of limitations.

3. As for the County, except for the Windelers' claims based on the County's denial on October 17, 2017 of their variance appeal, all of the County's relevant actions occurred prior to July 24, 2017, and those non-variance appeal claims against the County are barred by the two-year statute of limitations.

4. Any challenges to the moratorium enacted on November 15, 2001, the closure of the Wait List on December 31, 1990, or the setting of the buildout target on July 24, 2003, are barred by the applicable statute of limitations even though the moratorium remains in place and the Wait List remains closed.

5. The moratorium, the closing of the Wait List, and the setting of the buildout target are not "continuing violations" with effectively renewing accrual dates because "the statute of limitations runs from the operative decision and not from its inevitable consequences that are not separately actionable."  <u>Ellis v. Salt River Proj. Ag. Improv. & Power Dist.</u>, 24 F.4th 1262, 1272 (9th Cir. 2022).  The "operative decisions" that resulted in Plaintiffs' losses, if any, were taken long before July 24, 2017, even if the consequences of those decisions – the inability to develop their land – are still being felt by Plaintiffs.

6. Any claim that an assessment was improperly imposed on any of Plaintiffs' properties, or constituted a taking, is also barred by the statute of limitations because the last such assessment was in 2001.  <u>See also</u> Cal. Code Civ. Proc. §§ 526a, 860.

**B.    Lack of Compensable Property Right**

7.    Because the Constitution protects rather than creates property interests, the existence of a property interest is the threshold question of any takings analysis, and it is determined by reference to existing rules or understandings that stem from an independent source such as state law.  Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998).

8.    Potential water users do not hold a compensable right in any potential connection to a government-controlled water supply source.  McMillan v. Goleta Water Dist., 792 F.2d 1453, 1457-1458 (9th Cir. 1986); Gilbert v. State of California, 218 Cal.App.3d 234, 250 (1990) ("California law does not recognize potential water use as a compensable property right.").

9.    Plaintiffs' regulatory takings claims under both the Lucas and Penn Central doctrines fail because at all times Plaintiffs were merely potential water users, and they were never actual water users.

10.   In addition, Plaintiffs have no protectable property interest in a County development permit to build a house on a waterless vacant lot because they failed to obtain a water and sewer connection, be placed on the CCSD wait list, or obtain a CCSD intent to serve letter, during the times that those avenues were available to Plaintiffs, and because they did not, and cannot, present proof of "adequate water and sewage disposal capacity available to serve the proposed development," required by County Code §§ 23.04.430, 19.07.041 and other state and local laws.

11.   Plaintiffs have no protectable property interest in a variance that seeks to bypass state variance laws, California Fire, Building and Plumbing Codes, County Codes, and other regulations, to allow the Windeler Plaintiffs (who applied) or the other Plaintiffs (who did not) to obtain a development permit based on vague proposals to drill a well or truck in and store water, with no evidence to

support the viability or legality of such proposals or even the existence of water under any of the Plaintiffs' vacant lots.

12. Plaintiffs' substantive due process claims fail for the same reasons given above.

13. The Court previously found, on a motion to dismiss, that Plaintiffs' claims were not barred by <u>Gilbert</u> and related cases because Plaintiffs alleged that they were deprived of all economically viable use of their properties.  Dkt. 28 at 5.

14. However, the evidence demonstrates that a lack of water and sewer connection does not completely deprive Plaintiffs' properties of value.

15. Therefore, Plaintiffs' status as mere potential water and sewer users dooms their takings claims under <u>Gilbert</u> and related cases because they have no compensable property right to prospective water and sewer connections.

**C. Per Se Regulatory Taking**

16. A regulatory *per se* taking occurs when regulation deprives an owner of all economically beneficial uses of their land.  <u>Lucas v. S. Carolina Coastal Council</u>, 505 U.S. 1003 (1992).  A *per se* taking under <u>Lucas</u> requires a 100% loss of value.

17. Because, as stated above, Plaintiffs did not suffer a complete deprivation of all property value, Plaintiffs' claims under <u>Lucas</u> fail.

**D. Penn Central Taking – Water and Sewer Connections**

18. Even if Plaintiffs' claims were not barred by their lack of a property interest in a potential water or sewer connection, the impact to their properties does not amount to a taking under <u>Penn Central Trans. Co. v. City of New York</u>, 438 U.S. 104 (1978) and its progeny.

19. Under the <u>Penn Central</u> doctrine, the Court must consider three factors to determine if a regulatory action has resulted in a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. <u>Bridge Aina Le'a, LLC v. Land Use Commn.</u>, 950 F.3d 610, 630 (9th Cir. 2020); <u>Penn Central</u>, 438 U.S. 104, 124.

20. In considering the economic impact of an alleged taking, the Court compares the value that has been taken from the property with the value that remains in the property. <u>Colony Cove Props., LLC v. City of Carson</u>, 888 F.3d 445, 450 (9th Cir. 2018).

21. Assuming Plaintiffs had some property interest in potential water and sewer connections – which, as discussed above, they do not – the Court acknowledges that a lack of water and sewer services greatly diminishes the value of Plaintiffs' properties compared to having water and sewer at the properties.

22. However, the lack of any right under California law to prospective utility hookups means that Plaintiffs have suffered no compensable loss from Defendants' failure to authorize such hookups.

23. The second factor of the <u>Penn Central</u> test analyzes to what degree the alleged government action interfered with the property owners' distinct investment-backed expectations.

24. A court may deny a <u>Penn Central</u> takings claim solely on the absence of objectively reasonable and distinct investment-backed expectations. <u>See</u> <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1005 (1984); <u>Colony Cove Props.</u>, 888 F.3d at 452; <u>Guggenheim v. City of Goleta</u>, 638 F.3d 1111, 1120 (9th Cir. 2010).

25. Unilateral expectations or abstract needs cannot form the basis of a claim that the government has interfered with property rights. <u>Bridge</u>, 950 F.3d at 633; <u>Ruckelshaus</u>, 467 U.S. at 1005.

26.   The Court finds that any investment-based expectation in an
      absolute right to water and sewer connections in Cambria – or to
      a development permit in the absence of such connections – was
      not objectively reasonable.

27.   The evidence shows that water is, and has long been, limited in
      the Cambria area and it was, or should have been, expected that
      water supplies could become too limited to support future
      services from the available water sources.

28.   Further, Plaintiffs did not act to protect or further any
      expectation in water and sewer hookups by signing up for the
      Wait List when that was an option or by purchasing a water
      meter from another property owner.

29.   Additionally, the Coastal Commission has repeatedly
      demonstrated that it is extremely unlikely to authorize any
      further development in Cambria, other than possibly affordable
      housing.  This makes any expectation that Plaintiffs' properties
      could be developed for private market-rate housing objectively
      unreasonable.

30.   As for the nature of the government action, government action
      that singles out a landowner from similarly situated landowners
      raises the specter of a taking; however, a generally applicable
      scheme does not weigh in favor of a takings finding.  Bridge,
      950 F.3d at 636.

31.   A taking may more readily be found when the governmental
      interference with property can be characterized as a physical
      invasion by government than when interference arises from some
      public program adjusting the benefits and burdens of economic
      life to promote the common good.  Colony Cove, 888 F.3d at 454.

32.   The overwhelming evidence shows that Plaintiffs were treated
      identically to all other similarly situated landowners – i.e.,
      landowners with properties that are not connected to water and

sewer utilities and were never placed on the Wait List for such connections.

33. Further, the evidence shows that any invasion of rights that might be purported to exist was non-physical and was for the purpose of promoting very significant public interests that require balancing of the needs of the entire public through the management of a scarce and necessary public good.

34. Therefore, the Court finds that, even though the alleged taking would have reduced the value of Plaintiffs' properties greatly, Plaintiffs' lack of any reasonable investment-based expectation in development of the properties, the strong, evidence-based public interest reasons for the regulations at issue, and the failure of Defendants to single out Plaintiffs for special treatment in any way means that no taking occurred under the Penn Central standard.

**E.   Penn Central Taking – Windeler Variance Application**

35. If there were some compensable property interest in the variances sought, the denial of the variances – i.e., being bound by the County codes for which variances are sought – likely diminishes the value of the Windelers' property substantially compared to its value with the variances. Without the variances or a CCSD connection – which cannot be obtained by the Windelers – no meaningful development of the Windelers' property is possible.

36. However, even if the first part of the test weighs in the Windelers' favor, the Windelers fail to establish any support in favor of the second and third parts of the Penn Central test.

37. The Windelers did not establish that the County's denial of their requested variance interfered with any reasonable, investment-backed expectations that they might have had.

38. The Windelers have not demonstrated that it would have been reasonable to expect the significant variances that they requested

would have been granted by the County such that a reasonable
person would have depended on such variances when making
investment decisions.

39.   They had little to no support for their requested variances that
would demonstrate to the County that the variances would not
harm health or safety of the community.

40.   The Windelers have also not shown that they personally,
subjectively believed that they would receive such variances
before making any sort of investment decision.

41.   The County also established that it had numerous legitimate
governmental reasons for its denial of the variances requested by
the Windelers.

42.   The Windelers failed to show that they could provide a safe and
effective water and septic supply to support the proposed
development on their property.  In the absence of this showing,
the County was acting in support of public health and welfare by
denying the requested variances.

**F.   Coastal Commission Role**

43.   The evidence further demonstrates that regardless of the actions
of Defendants, the Coastal Commission would not have
authorized any development of Plaintiffs' properties during the
relevant time period.

44.   The Commission maintains a right under California law to
regulate development within the Coastal Zone and has made
clear in numerous rulings that it will not allow further private
development in Cambria other than, perhaps, affordable housing
*even if the applicant has a water connection* from CCSD.

45.   Therefore, any losses due to an inability to develop Plaintiffs'
properties were not caused solely by Defendants' actions.  The
Court finds that even if Defendants had done everything
Plaintiffs claim that they should have done, the Coastal

Commission would have blocked development of their properties and is likely to continue blocking such development in Cambria for the mid- to long-term future.

IT IS SO ORDERED.

Date: September 6, 2022

Dale S. Fischer
United States District Judge